# STATE OF MICHIGAN

# COURT OF APPEALS

KINGS LANE GP INC, SJS INVESTMENTS
INC, and EESAM ARABBO,

        Plaintiff-Counterdefendants-
        Appellants,

v

KINGS LANE LIMITED DIVIDEND HOUSING
ASSOCIATION LIMITED PARTNERSHIP, PNC
MULTIFAMILY CAPITAL INSTITUTIONAL
FUND XXXI LIMITED PARTNERSHIP,
COLUMBIA HOUSING SLP CORPORATION,
and PNC BANK NA,

        Defendants-Counterplaintiffs-
        Appellees.

UNPUBLISHED
December 4, 2018

No. 338967
Genesee Circuit Court
LC No. 15-105009-CB

Before: SHAPIRO, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Plaintiffs-counterdefendants, Kings Lane GP Inc. ("Kings Lane GP"), SJS Investments Inc. ("SJS Investments"), and Eesam Arabbo ("Arabbo") ("collectively plaintiffs"), appeal by leave granted[1] two orders. The first order denied plaintiffs' motion to dismiss Arabbo pursuant to case evaluation. The second order granted summary disposition in favor of defendants-counterplaintiffs, Kings Lane Limited Dividend Housing Association Limited Partnership ("Kings Lane LP"), PNC Multifamily Capital Institutional Fund XXXI Limited Partnership ("PNC Capital"), Columbia Housing SLP Corporation ("Columbia"), and PNC Bank NA ("PNC Bank") (collectively "defendants"). We affirm in part, reverse in part, and remand for further proceedings.

## I. BASIC FACTS

---

[1] *Kings Lane GP In v Kings Lane Ltd Divident* [sic] *Housing Association*, unpublished order of the Court of Appeals, issued September 20, 2017 (Docket No. 338967).

The lengthy background of this case was discussed in this Court's February 23, 2017, opinion in *S&S Builders, Inc v Kings Lane LP et al*, unpublished per curiam opinion of the Court of Appeals, issued February 23, 2017 (Docket Nos. 328654 and 328745) and does not need repeating.

Relevant to the case before us, Kings Lane GP, SJS, and Arabbo alleged the following claims: (1) against PNC Bank for tortious interference with their business relationship with Kings Lane LP under the partnership agreement; (2) fraud and misrepresentation against PNC Capital and PNC Bank for making false promises that they would pay for the completion of the project, reserves, and shortfall; (3) conspiracy and concert of action against all defendants for engaging in concerted action to deprive plaintiffs of their interest in Kings Lane LP; (4) breach of contract against PNC Capital and Columbia; (5) breach of fiduciary duty against PNC Capital and Columbia; and (6) declaratory judgment to the effect that Kings Lane GP remains the general partner of Kings Lane LP.

Plaintiffs' claims and defendants Kings Lane LP and Columbia's counterclaims (a carry-over from a previous lawsuit) proceeded to case evaluation. Arabbo accepted the award in his favor and in favor of the participating defendants, and defendants accepted all the awards. Arabbo moved to be dismissed from the case. As will be discussed in greater detail below, the trial court denied Arabbo's motion.

Defendants then moved for summary disposition of plaintiff's claims pursuant to MCR 2.116(C)(7) (statute of limitations) and (10) (no genuine issue of material fact). After hearing counsel's arguments the trial court granted defendants' motion for summary disposition of all of plaintiffs' claims.

Defendants now appeal by leave granted.

## II. THE IMPACT OF CASE EVALUATION

Plaintiffs argue that the trial court erred in its application of the court rules regarding case evaluation and the effect of mutual acceptance. Arabbo accepted the case evaluation award rendered on his claims against all defendants and also accepted the award on defendants' counterclaims. All defendants accepted the award rendered in Arabbo's favor and against them. Appellants urge that mutual acceptance of the case evaluation award by Arabbo and all of the defendants required that he be dismissed from the action under MCR 2.403(L)(3) and MCR 2.403(M)(1) and (3). We agree.

The interpretation and application of a court rule presents a question of law which is reviewed de novo. *Henry v Dow Chem Co*, 484 Mich 483, 495; 772 NW2d 301 (2009); *Magdich & Assocs PC v Novi Dev Assocs LLC*, 305 Mich App 272, 275; 851 NW2d 585 (2014).

Case evaluation is governed by MCR 2.403. The relevant portions of MCR 2.403 state:

(L) Acceptance or Rejection of Evaluation.

(1) Each party shall file a written acceptance or rejection of the panel's evaluation with the ADR clerk within 28 days after service of the panel's

-2-

evaluation. *Even if there are separate awards on multiple claims, the party must either accept or reject the evaluation in its entirety as to a particular opposing party.* The failure to file a written acceptance or rejection within 28 days constitutes rejection.

\* \* \*

(3) In case evaluations involving multiple parties the following rules apply:

(a) Each party has the option of accepting all of the awards covering the claims by or against that party or of accepting some and rejecting others. However, *as to any particular opposing party, the party must either accept or reject the evaluation in its entirety*.

(b) A party who accepts all of the awards may specifically indicate that he or she intends the acceptance to be effective only if

(i) all opposing parties accept, and/or

(ii) the opposing parties accept as to specified coparties.

*If such a limitation is not included in the acceptance, an accepting party is deemed to have agreed to entry of judgment, or dismissal as provided in subrule (M)(1), as to that party and those of the opposing parties who accept,* with the action to continue between the accepting party and those opposing parties who reject.

\* \* \*

(M) Effect of Acceptance of Evaluation.

(1) If all the parties accept the panel's evaluation, judgment will be entered in accordance with the evaluation, unless the amount of the award is paid within 28 days after notification of the acceptances, in which case the court shall dismiss the action with prejudice. The judgment or dismissal shall be deemed to dispose of all claims in the action . . .

\* \* \*

(3) *In a case involving multiple parties, judgment, or dismissal as provided in subrule (1), shall be entered as to those opposing parties who have accepted the portions of the evaluation that apply to them.* [Emphasis added].

Arabbo interprets the rule to mean that his acceptance of the case evaluation awards results in his dismissal from the case. Defendants argue that the court rule does not compel such a conclusion. Court rules are interpreted using the principles of statutory construction. *Henry,*

484 Mich at 495. The meaning of the rule should be ascertained from the plain language of the rule as well as its place within the structure of the Michigan Court Rules. *Id.*

All parties agree that the general purpose behind MCR 2.403 is to expedite and simplify the final settlement of cases before trial. *Magdich*, 305 Mich App at 276. *Mercantile Bank Mortgage Co LLC v NGPCP/BRYS Centre LLC,* 305 Mich App 215, 225; 852 NW2d 210 (2014), provides a concise explanation as to how the case evaluation process works:

> Case evaluation is a mediation proceeding. During case evaluation, the parties submit and argue a concise summary of their factual and legal positions to a panel of three independent evaluators. The case evaluators must "include a separate award as to each plaintiff's claim against each defendant and as to each cross-claim, counterclaim, or third-party claim that has been filed in the action." "[A]ll . . .claims filed by any one party against any other party shall be treated as a single claim."

> A party must file an acceptance or rejection to the panel's evaluation within 28 days. MCR 2.403(L)(3)(a) provides that, in cases involving multiple parties, a party may accept awards against some opposing parties while rejecting awards against other opposing parties:

>> Each party has the option of accepting all of the awards covering the claims by or against that party or of accepting some and rejecting others. However, as to any particular opposing party, the party must either accept or reject the evaluation in its entirety.

> "If all parties accept the panel's evaluation, the case is over." "If all or part of the evaluation of the case evaluation panel is rejected, the action proceeds to trial in the normal fashion." A party's failure to file an acceptance or rejection constitutes a rejection. When a party's response does not conform to the court rules, the trial court should deem it a rejection. [*Mercantile Bank*, 305 Mich App at 223–24 (footnotes omitted).]

In *Mercantile Bank* this Court interpreted the relevant part of MCR 2.403(L)(3) as follows:

> In cases involving multiple parties, MCR 2.403(L)(3) gives a party two options: "accepting all of the awards covering the claims by or against that party" or "accepting some and rejecting others." The grammar of this rule indicates that the word "some" in the phrase "accepting some and rejecting others" refers to the *awards*, not the *parties*. Because MCR 2.403(K)(2) requires the case evaluation panel to issue a separate award as to each plaintiff against each defendant, if the case evaluation panel follows MCR 2.403(K)(2), a plaintiff will be able to accept awards against some defendants while rejecting awards against other defendants. [*Mercantile Bank*, 305 Mich App at 225.]

*Mercantile Bank* involved a situation where the case evaluation panel issued a single award encompassing multiple defendants, and the plaintiff attempted to partially accept and partially

-4-

reject that single award with respect to the multiple defendants. In effect, the plaintiff sought to accept the award against the personal guarantors but rejected the award against other defendants. *Id.* at 219-220. This Court concluded that the rule did not allow such a partial acceptance and rejection of a single award and found that the trial court erred by finding to the contrary:

> Here, the case evaluation panel did *not* follow MCR 2.403(K)(2), but instead issued a single award. Mercantile Bank attempted to partially accept and partially reject the single award. The court rules do not allow a party to partially accept and partially reject a single award. Because Mercantile Bank's response was an improper response, the case evaluation panel stated that Mercantile Bank rejected the award. Further, because a party may not partially accept and partially reject a single award, the trial court erred when it determined that Mercantile Bank could partially accept the award. [*Id.* at 215. (footnote omitted).]

In this case, the case evaluation panel did not issue a single award on multiple claims. The panel gave separate case evaluation awards for Arabbo (party 3) against defendants (parties 4, 5, 6, and 7). Arabbo and all 4 defendants accepted that separate award. The panel also gave separate case evaluation awards for defendants-counterplaintiffs Kings Lane LP and Columbia (parties 4 and 6) against all 3 plaintiffs (parties 1, 2, and 3). Arabbo and all 4 defendants accepted those awards. The case evaluation acceptance form gave the parties the option to accept conditioned on the acceptance of all opposing parties. However, none of the parties exercised their right to elect a conditional acceptance.

In support of its position that Arabbo should not be allowed to escape the case while leaving only uncollectible shell corporations behind PNC Bank cites *Minority Earth Movers, Inc v Walter Toebe Constr Co*, 251 Mich App 87; 649 NW2d 397 (2002). The case does not come close to supporting PNC Bank's position. In *Minority Movers*, the Court addressed a situation in which the case evaluation resulted in an award in the plaintiff's favor against the defendant in the amount of $135,000, and an award in favor of the defendant on its counterclaim against the plaintiff if the amount of $100,000. Both parties accepted the awards. However, rather than simply entering a judgment on the difference between the mediation awards, which would have been $35,000 for the plaintiff, the trial court entered two separate judgments so as to accommodate the plaintiff's attorney's desire to reap a higher fee. *Id.* at 89-91. The court rule did not provide whether separate judgments on the claim and counterclaim were necessary or whether a net judgment for the difference was appropriate. *Id.* at 93. After discussing a number of reasons why two judgments were inappropriate, the Court concluded:

> Finally, the purpose of the mediation rule is to expedite and simplify the final settlement of cases. *Henderson,*[ *v Sprout Bros, Inc,* 176 Mich App 661, 667; 440 NW2d 629 (1989)]. That purpose is hindered if parties are unaware of whether separate or aggregate judgments will be entered. For example, in this case, plaintiff is apparently not collectible. Defendant knew this and argued that if it had any inclination that plaintiff would obtain a separate $135,000 judgment that would not be offset by the amount awarded on defendant's counterclaim, it would not have accepted the mediation evaluations. In other words, defendant would not have accepted the $135,000 evaluation against it if it did not believe that it would also benefit from the $100,000 evaluation in its favor. It is

undisputed that before judgment was entered, defendant tendered $35,000 to plaintiff. Only then did defendant learn that plaintiff's counsel wanted separate judgments. . . .The entry of two judgments in this matter has significantly complicated the final settlement of this case. Had a single net judgment been entered, defendant would have tendered a check for the net amount owed, and the matter would have been concluded. [*Minority Earth Movers,* 251 Mich App at 98–99.]

*Minority Earth Movers* does nothing to support defendants' position that a party's "not collectible" status has any effect on the plain language of the court rule.

Nor does *Minority Earth Movers* support defendants' attempt to treat Arabbo as anything other than a separate party. In *Beauchemin v Schmidt*, unpublished per curiam opinion of the Court of Appeals, (Docket No. 306510), our Court observed:

The word "party" is not specifically defined by the court rule, thus, we turn to a dictionary definition to assist us in determining the plain meaning of the term. . . .Party is defined as "[o]ne by or against whom a lawsuit is brought." Black's Law Dictionary (9th ed). This definition makes it clear that a party is a single individual. Since the definition of party contemplates a single individual, and there were three separately named defendants in the case evaluation, the trial court correctly concluded that the case evaluation involved multiple parties, and thus, limited acceptance by the Hall defendants was permitted pursuant to MCR 2.403(L)(3). See *Dane Constr, Inc v Royal's Wine & Deli, Inc,* 192 Mich App 287, 290; 480 NW2d 343 (1991) ("We agree with the trial court that MCR 2.403(L)(3) was appropriately applied in this case because there were two defendants.").

Because MCR 2.403(L)(3)(b)(ii) permits a limited acceptance when there are multiple parties involved, the Hall defendants properly accepted the case evaluation on the complaint and accepted with limitations the case evaluation on the counterclaim, as the limitation was that the acceptance would be effective only if all opposing parties accepted as to the co-defendants. The fact that the multiple parties were aligned on one side against the single plaintiff is not dispositive. Instead, MCR 2.403(L) clearly provides for one of two scenarios: an evaluation involving two single opposing sides or an evaluation involving two opposing sides with co-parties on one or both sides. See 2 Longhofer, Michigan Court Rules Practice, pp 537–538 ("Under MCR 2.403(L)(1), each party to the action must file a written acceptance or rejection of the case evaluation award . . . In actions involving multiple parties . . .subrule 2.403(L)(3)(b) permits a party accepting all of the awards to condition that acceptance on . . . the acceptance by the opposing parties as to specified co-parties."). The limited acceptance was in conformity with MCR 2.403(L)(3)(b)(ii) and the purpose of that rule—to fully settle the entire case. See Committee Report, 451 Mich at 1218 ("Current MCR 2.403(L)(3) provides for conditional acceptances in multiple-party cases. It permits a party to indicate that it intends its acceptance to be effective only if all opposing parties accept. The principle is to allow a party to take the position that

it will accept the award only if it has the effect of disposing the entire lawsuit.");
*Henderson v Sprout Bros, Inc,* 176 Mich App 661, 668; 440 NW2d 629 (1989)
superseded by rule on other grounds MCR 2.403(L)(1). [*Beauchemin*, unpub op,
p 5.]

As previously stated, none of the parties conditioned their acceptance. Applying the plain
language of the court rule to these undisputed facts indicates that defendants and Arabbo settled
all claims brought by and against Arabbo by unconditionally accepting all case evaluation
awards for and against Arabbo. In short, "both parties accepted the case evaluation award
without qualification, and therefore, the case is over. The trial court erred by denying the motion
to dismiss the case with prejudice." *Magdich*, 305 Mich App at 281.

### III. TORTIOUS INTERFERENCE OF CONTRACT AND BUSINESS RELATIONSHIP

Plaintiffs argue that the trial court erred in granting PNC Bank summary disposition on
plaintiffs' claims for tortious interference of contract and a business relationship. We disagree.

"This Court reviews de novo a circuit court's decision whether to grant or deny summary
disposition." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205; 815 NW2d 412 (2012).

Because plaintiffs specifically claim that PNC Bank interfered with the partnership
agreement, the issue is not whether PNC tortiously interfered with plaintiffs' business
relationship or expectancy, but whether PNC tortiously interfered with a contract. See *Knight
Enterprises v RPF Oil Co*, 299 Mich App 275, 280; 829 NW2d 345 (2013), lv den 494 Mich
857 (2013) "The elements of tortious interference with a contract are (1) the existence of a
contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the
defendant." *Knight*, 299 Mich App 280, quoting *Health Call of Detroit v Atrium Home & Health
Care Servs, Inc,* 268 Mich App 83, 89–90, 706 NW2d 843 (2005).

A claim for tortious interference with a contract requires proof of "the intentional doing
of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the
purpose of invading the contractual rights or business relationship of another." *Knight
Enterprises*, 299 Mich App at 280, quoting *Derderian v Genesys Health Care Systems*, 263 Mich
App 364, 382; 689 NW2d 145 (2004). "Thus, it is an essential element of a claim of tortious
interference with a contract that the defendant 'unjustifiably instigated or induced' the party to
breach its contract. *Knight Enterprises*, 299 Mich App at 281. Therefore, in order to prevail on
a claim for tortious interference with a contract, plaintiffs had to provide either that PNC Bank
(1) committed an act that was so wrongful that it had no justification whatsoever for committing
that act, and did so with malice and the intent to induce Kings Lane LP to breach the partnership
agreement; or, (2) committed a lawful act with malicious intent to instigate Kings Lane LP to
breach the agreement. See *Id*.

Plaintiffs have presented no evidence indicating that defendant PNC Bank committed
either a per se wrongful act or a wrongful act with malice that induced the other defendants to
breach their contract or end their business relationship with plaintiffs. As pointed out by the trial
court, the breach of contract and effective destruction of plaintiffs' business relationship with
Kings Lane LP, Columbia, and PNC Capital occurred in 2008 and 2009, when S&S Builders

filed its construction lien against the project and sued Kings Lane LP for unpaid work and materials. Section 6.7 of the Restated Partnership Agreement provides, in relevant part:

> 6. 7 <u>Excess Costs and Expenses Through Mortgage Loan Conversion.</u> The General Partner and the Developer shall each be obligated, jointly and severally, to pay any costs or expenses (including, but not limited to those which may be operational in nature), excluding the Deferred Development Fee, incurred by the Partnership to fund Project rehabilitation, development, operations, or other costs and expenses which are necessary to *(a) complete the Project without defect in substantial accordance with the final approved Plans and Specifications of the Project, in a good and workmanlike manner, free and clear of all mechanics', materialmen's or similar liens* . . . [Emphasis added.]

Not only did the breach occur years before PNC Bank's involvement, none of the evidence demonstrates that PNC Bank tortiously interfered with the partnership agreement. There was nothing improper about any of the evidence plaintiffs cite. Moreover, plaintiffs failed to demonstrate that PNC Bank's desire for certain tax credits caused the breach. Accordingly, there is no genuine issue of material fact that defendant PNC Bank did not commit any tortious acts which interfered with the other parties' contracts or business relationship.

## IV. FRAUD AND MISREPRESENTATION

Plaintiffs argue that the trial court erred in granting defendants summary disposition on plaintiffs' fraud claim. We disagree.

Our Court has indicated:

> To prove a claim of fraudulent misrepresentation, or common-law fraud, a plaintiff must establish that: (1) the defendant made a material representation; (2) the representation was false; (3) when the representation was made, the defendant knew that it was false, or made it recklessly, without knowledge of its truth, and as a positive assertion; (4) the defendant made it with the intention that the plaintiff should act upon it; (5) the plaintiff acted in reliance upon the representation; and (6) the plaintiff thereby suffered injury. *Roberts v Saffell*, 280 Mich App 397, 403; 760 NW2d 715 (2008), aff'd 483 Mich 1089; 766 NW2d 288 (2009).]

"Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery." *Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012).[2]

---

[2] The trial court found that plaintiff had failed to allege the circumstances of fraud or misrepresentation as required by MCR 2.112(B)(1) ("[i]n allegations of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity"), and failed to present documentary evidence of any statement of fact relied upon by plaintiffs.

"[A]n action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud. *Hi-Way Motor Co v Intl Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). There is, however, a "bad faith" exception to that general rule. "A fraudulent misrepresentation may be based on a promise made in bad faith, without [the] intention of performance." *Foreman v Foreman*, 266 Mich App 132, 147; 701 NW2d 167 (2005), quoting *Hi–Way Motor Corp*, 398 Mich at 337-338; 247 NW2d 813 (1976). "Thus, a claim of fraud lies 'where although no proof of the promisor's intent exists, the facts of the case compel the inference that the promise was but a device to perpetrate a fraud.'" *Id*.

After learning of the issues with the sewer, Brian Sexton, a vice president at PNC Capital, sent appellants an email, indicating that funds would be made available to cover budgetary shortfalls. Plaintiffs argue that defendants knew the representation was false or made recklessly without regard to truth with the intention that plaintiffs would act in reliance on it. However, plaintiffs have failed to raise a genuine issue of fact that, at the time of Sexton's email, defendants had no intention of extending funds and instead hoped that Arabbo would rely on the statement to his detriment. Plaintiffs bring forth no evidence as to how or why defendants would have schemed to do so. In short, plaintiffs failed to raise a genuine issue of material fact that when the representation was made, defendants knew that it was false, or made it recklessly, without knowledge of its truth, and as a positive assertion. See *Roberts*, 280 Mich App at 403.

Instead, plaintiffs' claim is "more aptly characterized as a breach of contract" and, therefore, plaintiffs must be able to prove that the loan commitment "amounted to a legally enforceable agreement." See *Huntington Nat'l Bank v Daniel J Aronoff Living Trust*, 305 Mich App 496, 507-508; 853 NW2d 481 (2014). That is, "in order for there to be an enforceable agreement between the parties, there must be 'mutual assent' to be bound – that is, the parties must have a 'meeting of the minds' on all the essential elements of the agreement." *Id.* at 508.

The Court in *Huntington Nat'l Bank* addressed the application of MCL 566.132(2), which provides:

An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:

---

Paragraphs 79-84 of plaintiff's complaint alleges that defendants PNC Capital and PNC Bank "promised that funds would be made available for the completion of the Project and the reserves and budgetary shortfalls," that they made these false representations with the intent that plaintiffs would act on them, and that plaintiffs acted in reliance upon those misrepresentations. Those allegations appear sufficient to inform the defendants of the nature of the fraud claims they were facing. However, even if the allegations were not pleaded with particularity, plaintiffs could have sought to amend the complaint to plead with particularity. MCR 2.118(A)(2). Therefore, the trial court erred to the extent it granted summary disposition on that basis.

(a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.

MCL 566.132(1), by contrast, has a more relaxed standard for demonstrating the existence of an agreement. Whereas MCL 566.132(2) requires that "promise or commitment" be "in writing and signed with an authorized signature by the financial institution," MCL 566.132(1) allows an agreement to be shown by "contract, or promise, or a note or memorandum." This Court explained:

> In 1992, Michigan's Legislature decided to provide greater protection to financial institutions from potentially fraudulent or spurious claims by disgruntled borrowers. See 1992 PA 245. To that end, the Legislature provided that no one may bring an "action" against "a financial institution" if the action seeks to "enforce" a promise or commitment by the financial institution "unless the promise or commitment is in writing and signed with an authorized signature by the financial institution." This provision applies to a "promise or commitment"— as alleged here—to "lend money." Although this Court has operated on the assumption that a memorandum may be sufficient to meet the requirements stated under MCL 566.132(2), it has not directly construed the requirements stated under MCL 566.132(2). [*Huntington Nat Bank*, 305 Mich App at 509.]

The trial court in *Huntington* had concluded that MCL 566.132(2) barred any defense premised on an attempt to enforce an oral promise to loan money that deviated from the terms ultimately reduced to writing and that any letters or documents short of an agreement itself failed. This Court agreed:

> [I]t is noteworthy that the Legislature did not provide that a party may meet the writing requirement of MCL 566.132(2) with evidence of a "note or memorandum of the agreement, contact, or promise", as it did under MCL 566.132(1). Instead, it barred any "action" to enforce a promise or commitment to lend money unless the "promise or commitment" is in writing and signed with an authorized signature. MCL 566.132(2). By requiring that the "promise or commitment"—as opposed to some other document—must be in writing and have an authorized signature, it is evident that the Legislature intended to provide financial institutions with a greater degree of protection than that afforded generally under MCL 566.132(1). [*Huntington Nat Bank*, 305 Mich App at 510.]

The relaxed evidence permitted in an action involving MCL 566.132(1), therefore, is insufficient in an action that involves MCL 566.132(2):

> It is not, therefore, sufficient to show that the financial institution memorialized a portion of the agreement or reduced a preliminary understanding to writing and then later orally agreed to proceed under that framework, nor is it sufficient to present a series of documents—some signed and others not signed—that together purport to be the agreement; rather, the proponent must present evidence that the financial institution actually agreed to the essential terms of the promise or

commitment, and each of those essential terms must be accompanied by the required signature. [*Huntington Nat'l Bank*, 305 Mich App at 511.]

This Court agreed with the trial court that the undisputed evidence showed the parties never finalized their agreement. Even if the defendants could meet the requirements under MCL 566.132(2) with memoranda and other documentary evidence to show that the bank agreed to loan the money under terms that were different from the ultimate agreement, the documents still had to contain all of the essential terms of the contract. *Huntington Nat'l Bank*, 305 Mich App at 512. In that case, there were some documents indicating a general agreement, including a checklist from the bank, but "[t]he checklist does not define the interest rate, does not provide for periodic payments, does not specify the term of the loan, and does not indicate whether it refers to a revolving line of credit or a fixed loan." *Id*.

The same is true for this case. Even though Sexton's email may have demonstrated a general agreement to contribute additional working capital funds to bridge the remaining budget gap, the agreement was not reduced to a final agreement that would satisfy the statute of frauds.

The trial court properly granted summary disposition on plaintiffs' fraud claim because, assuming the claim was properly pled, the alleged agreement involved future conduct and did not satisfy the statute of frauds.

## V. CONSPIRACY AND CONCERT OF ACTION

Plaintiffs argue that the trial court erred in dismissing plaintiffs' conspiracy and concert of action claims. We disagree.

This Court has noted that there "is no action for conspiracy alone; there must be an underlying actionable tort." *Yoost v Caspari*, 295 Mich App 209, 224 n 2; 813 NW2d 783 (2012).

> This Court has defined a civil conspiracy as "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384, 670 NW2d 569 (2003), aff'd 472 Mich 91 (2005) (quotation marks and citation omitted). In addition, to establish a concert-of-action claim, a plaintiff must prove "that all defendants acted tortiously pursuant to a common design" that caused harm to the plaintiff. *Abel v Eli Lilly & Co*, 418 Mich 311, 338; 343 NW2d 164 (1984). For both civil conspiracy and concert of action, the plaintiff must establish some underlying tortious conduct. *Holliday v McKeiver*, 156 Mich App 214, 217–219; 401 NW2d 278 (1986); *Rencsok v Rencsok*, 46 Mich App 250, 252; 207 NW2d 910 (1973). [*Urbain v Beierling*, 301 Mich App 114, 131–132; 835 NW2d 455 (2013).]

Plaintiffs have not shown or alleged any other actionable tort committed to replace Kings Lane GP as general partner of Kings Lane LP. A partner cannot maintain an action in tort against a partner for arbitrary or bad faith breach of the partnership contract, as the *Urbain* Court explained:

"[A] partner [cannot] maintain an action in tort against a partner who by arbitrary or bad faith breach of the partnership contract has caused the termination of the partnership." *Gilroy,* 151 Mich App at 637 n 6; 391 NW2d 419. Because plaintiff's civil-conspiracy and concert-of-action claims are based on her claims related to the dissolution of the partnership and those claims arose only from the partnership agreement and therefore sound in contract rather than tort, plaintiff has failed to allege a separate actionable tort. Given that plaintiff has not established that defendants committed an underlying tort, she cannot sustain her claims of concert of action and civil conspiracy. Accordingly, the trial court properly granted summary disposition on those claims. [*Urbain*, 301 Mich App at 132.]

As previously addressed, the trial court properly granted summary disposition on plaintiffs' fraud claim. The fact that defendants allegedly violated the limited partnership agreement to replace the general partner, without more, does not amount to tortious conduct.

## VI. BREACH OF FIDUCIARY DUTY

Plaintiffs argue that the trial court erred when it granted defendants summary disposition on their breach of fiduciary duty claim. We disagree.

A fiduciary relationship is:

[a] relationship in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship. Fiduciary relationships-such as trustee-beneficiary, guardian-ward, agent-principal, and attorney-client require the highest duty of care. Fiduciary relationships [usually] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer. *In re Estate of Karmey*, 468 Mich 68, 75 n 2; 658 NW2d 796 (2003), quoting *Black's Law Dictionary* (7th ed).]

Michigan has specific statutory provisions regarding general and limited partnerships and the duties partners owe one another. Under the uniform partnership act, partners in a general partnership are accountable to each other as fiduciaries for each other's interests. MCL 449.21(1) ("[e]very partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property . . ."); *Band v Livonia Associates*, 176 Mich App 95, 113-114; 439 NW2d 285 (1989) ("The courts universally recognize the fiduciary relationship of partners and impose on them obligations of the utmost good faith and integrity in their dealings with one another in partnership affairs. Partners are held to a standard stricter than the morals of the marketplace and

their fiduciary duties should be broadly construed, 'connoting not mere honesty but the punctilio of honor most sensitive.' 59A Am Jur 2d, Partnership, § 420, p. 453.")

And, under Michigan's Uniform Limited Partnership Act, MCL 449.1101 *et seq*., a general partner of a limited partnership "has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners." MCL 449.1403(b). Accordingly, a general partner in a limited partnership owes a fiduciary duty to the limited partners. *Preston v Granada Management Corp*, 188 Mich App 667, 673; 470 NW2d 411 (1991).

However, a limited partner is more like a shareholder with regard to his ownership interest and the fellow owners of the limited partnership. A limited partner's liability for the obligations to the partnership and to other partners is expressly circumscribed by Michigan's Uniform Limited Partnership Act, which contains no language indicating that limited partners owe any fiduciary duties to each other or to general partners. See MCL 449.1303 (a limited partner can be liable for partnership obligation if actively engaged in the partnership's business operations); MCL 449.1502. Accordingly, nothing in the Uniform Limited Partnership Act compels a finding that limited partners owe a reciprocal fiduciary duty to the general partner of a limited partnership. In fact, the opposite is true. As such, the trial court properly granted summary disposition on plaintiffs' breach of fiduciary duty claim.

## VII. BREACH OF CONTRACT

Plaintiffs argue that the trial court erred in granting defendants summary disposition on plaintiffs' breach of contract claims. We disagree.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014).

Plaintiffs' complaint alleges breach of contract against PNC Capital and Columbia. Defendants' counterclaim alleges that Kings Lane GP and SJS Investments breached several provisions of the 2006 partnership agreement and that Arabbo breached his personal guaranty when it incurred expenses beyond the budget for sewer repairs without first obtaining Kings Lane LP's written consent and failed to fund the project budget shortfalls.

Plaintiffs' argument on appeal focuses entirely on defendants' counterclaims for breach of contract. Plaintiffs spend no time arguing the merits of their own claim. "A party cannot simply assert an error or announce a position and then leave it to this Court to 'discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.'" *Mitchell v Mitchell*, 296 Mich App 513, 524; 823 NW2d 153 (2012), quoting *Mitcham v Detroit,* 355 Mich 182, 203; 94 NW2d 388 (1959).

The housing project, while being rehabilitated/rebuilt, and managed by plaintiffs or entities owned by Arabbo, spent more than anticipated by the original limited partnership agreement and ended up defaulting on obligations to contractors like S&S Builders and the lender Berkadia. Those actions by plaintiffs or the entities under their control led to the

construction lien recorded by S&S Builders and the original actions filed in 2009. As pointed out by plaintiffs, §7.2 of the limited partnership agreement gave plaintiff Kings Lane GP, as general partner, the sole right to manage the project. However, while plaintiffs claim that defendants breached the terms of the contract by failing to pay the cost overruns as they were incurred, plaintiffs do not point to any specific provisions of the limited partnership agreement which required defendants to pay those costs. In fact, section 6.7 of the Restated Partnership Agreement provides, in relevant part:

> 6.7 <u>Excess Costs and Expenses Through Mortgage Loan Conversion.</u> The General Partner and the Developer shall each be obligated, jointly and severally, to pay any costs or expenses (including, but not limited to those which may be operational in nature), excluding the Deferred Development Fee, incurred by the Partnership to fund Project rehabilitation, development, operations, or other costs and expenses which are necessary to *(a) complete the Project without defect in substantial accordance with the final approved Plans and Specifications of the Project, in a good and workmanlike manner, free and clear of all mechanics', materialmen's or similar liens . . .* [Emphasis added.]

The contract language states that Arabbo agreed to pay operating deficits and cost overruns. The contract terms defined completion as completion of the project without any construction liens or defects. Since S&S Builders filed a construction lien against the project in 2008, the project was never completed as defined by the parties' agreement and defendants' obligation to make the final payment never came due. Accordingly, under the plain terms of the contract defendants were not obligated to pay the cost overruns or make the final capital contribution and plaintiff's claims for breach of those contractual obligations were properly dismissed.

## VIII. STATUTE OF LIMITATIONS/LACHES

Plaintiffs argue that the trial court erred in granting defendants summary disposition based on the statute of limitations. Although both parties raised and addressed the issue of statute of limitations, the trial court's ruling from the bench and written order did not address the statute of limitations. Therefore, contrary to plaintiffs' presentation of the issue, the trial court did not grant summary disposition on the basis of the statute of limitations. This Court's review should be limited to issues actually decided by the trial court. *Heydon v Media One of Southeast Michigan*, 275 Mich App 267, 278; 739 NW2d 373 (2007); *Love v City of Detroit*, 270 Mich App 563, 566 n 2; 716 NW2d 604 (2006).

## VIII. DECLARATORY RELIEF

Plaintiffs argue that the trial court erred when it denied plaintiffs' request for declaratory relief. We agree.

A trial court's decision to deny a declaratory judgment is reviewed de novo while its factual findings are reviewed for clear error. *Ter Beek v City of Wyoming*, 297 Mich App 446, 452; 823 NW2d 864 (2012), aff'd 495 Mich 1 (2014).

MCR 2.605(A)(1) provides: "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." "The existence of an actual controversy is a condition precedent to invocation of declaratory relief." *PT Today, Inc v Comm'r of Office of Fin & Ins Services*, 270 Mich App 110, 140; 715 NW2d 398 (2006).

> Generally, an actual controversy exists where a declaratory judgment is necessary to guide a plaintiff's future conduct in order to preserve the plaintiff's legal rights. What is essential to an 'actual controversy' under the declaratory judgment rule is that plaintiff plead and prove facts which indicate an adverse interest necessitating a sharpening of the issues raised. Generally, where the injury sought to be prevented is merely hypothetical, a case of actual controversy does not exist. [*Citizens for Common Sense in Gov't v Attorney General*, 243 Mich App 43, 55; 620 NW2d 546 (2000) (citations and quotation marks omitted).]

Section 7.7 of the limited partnership agreement specifically gives the limited partners the right to remove any general partner and to elect a new general partner on the basis of the performance of the general partner's obligations constituting fraud or other misconduct, or based on the violation of any provisions of the project document. Plaintiffs do not dispute that they failed to pay obligations as due and allowed a construction lien to be recorded against the property in 2008, a breach of the project documents.

While this would ordinarily enable and justify the removal of the general partner, Article XIV of the limited partnership agreement provides, in relevant part:

> Notwithstanding any other provisions of this Agreement or the Certificate of Limited Partnership, as amended (hereinafter referred to as "the Organizational Documents") of this Partnership to the contrary, the following provisions shall govern:
>
> (a) So long as the Secretary of the Department of Housing and Urban Development ("Secretary" or "HUD'') or the Secretary's successors or assigns is the insurer or holder of the mortgage note secured by the mortgage on Kings Lane Apartments, FHA Project No. 048-3S096, in the City of Burton, Genesee County, Michigan (the "Project"), no amendment to the Certificate of Limited Partnership, as amended, or this Agreement that results in any of the following will have any force or effect without the prior written consent of the Secretary:
>
> (i) Any amendment that modifies the term of the Partnership;
>
> * * *
>
> (v) A change in the General Partner of the Partnership; . . .

Defendants have not presented this Court with any evidence that they had permission from the Secretary of HUD before removing Kings Lane GP as general partner. Whether the removal

took effect remains in question and the trial court erred when it granted defendants summary disposition on plaintiffs' request for declaratory judgment.

## IX.  COLUMBIA'S STANDING

Finally, plaintiffs argue that the trial court erred in failing to dismiss Columbia's claims where Columbia had no standing to bring a claim.  The trial court's ruling from the bench and written order did not address plaintiffs' argument that they were entitled to summary disposition of defendant Columbia's counterclaims.  Our review is limited to issues actually decided by the trial court.  *Heydon,* 275 Mich App at 278; *Love*, 270 Mich App at 566 n 2.[3]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

---

[3] Moreover, it is difficult to reconcile plaintiffs' claim that Columbia has no interest in the action while in the same breath arguing that Columbia was not properly named as a general partner following Kings Lane GP's "removal."